## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHERYL A. HOLLAND, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-2964-K-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this case has been referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Opening Brief,* filed January 26, 2015 (doc. 12) and *Defendant's Response Brief*, filed March 24, 2015 (doc. 15). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.   BACKGROUND

### A.   Procedural History

Cheryl A. Holland (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.[2]  On May 18, 2011, Plaintiff applied for DIB, alleging disability beginning on January 20, 2010, due to hypertension and affective/mood disorders.  (R. at 19, 86.)  Her application was denied initially and upon reconsideration.  (R. at 89, 95.)  Plaintiff requested a hearing before an Administrative

---

[2]  The background information is summarized from the record of the administrative proceedings, which is designated as "R."

Law Judge (ALJ), and she personally appeared and testified at a hearing held on April 1, 2013. (R. at 19, 36-85, 99.) On April 10, 2013, the ALJ issued her decision finding Plaintiff not disabled. (R. at 16-29.) Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on June 19, 2014, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3, 13-14.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

B.    <u>Factual History</u>

1.    **Age, Education, and Work Experience**

Plaintiff was born on August 30, 1956, and was 56 years old at the time of the hearing before the ALJ. (R. at 43, 86, 159, 185.) She had a high school degree and past relevant work as a cleaner/machine tender, semi-conductor wafers. (R. at 46, 80.)

2.    **Medical, Psychological, and Psychiatric Evidence**

On May 30, 2005, Plaintiff underwent a sleep study at the request of her neurologist, Dr. Angela Huff. (R. at 449.) The study revealed mild obstructive sleep apnea; Bruxism, or teeth grinding during sleep; non-restorative sleep; an 8 on the Epworth sleepiness scale; and obesity. (R. at 450.) Plaintiff was encouraged to lose weight, not drive while drowsy, and to practice sleep hygiene measures. (*Id.*)

On July 5, 2005, Plaintiff underwent an Magnetic Resonance Imaging (MRI) of her neck and brain due to a right eye amaurosis fugax, or vision loss, after a transient ischemic attack. (R. at 465-472.) The MRI of the brain revealed "severe narrowing in the distal right internal carotid artery with suggestion of severe stenosis in the supraclinoid right ICA segment" as well as "[a]therosclerosis without evidence for high grade stenosis in the left cavernous internal carotid artery." (R. at 467.)

Based on Dr. Huff's referral, on August 9, 2005, Plaintiff underwent a neurocognitive evaluation

by Kris Weber, Ph.D. (R. at 438.) The evaluation included a series of assessments that revealed a range of "mildly impaired to average" in various areas of cognition, including executive functioning and memory and language. (R. at 441, 442.)

On May 30, 2006, at her optometrist's referral, Plaintiff presented to Dr. Wesley K. Herman at VisionQuest for a glaucoma suspect evaluation and test due to pain and discomfort around both eyes. (R. at 380, 383.) Her pertinent clinical history listed MHX - 05 "Mini Strokes," hysterectomy, and blood thinner. (*Id*.) Test results revealed a mild decrease in retinal nerve fiber layer thickness in both eyes, and Plaintiff was accessed with borderline glaucoma and cataracts in both eyes. (R. at 376-77, 379.) She was prescribed Xalatan and Ativan. (R. at 374-75, 379.)

Plaintiff called Dr. Herman on June 19, 2006, complaining of irritation in her left eye. (R. at 373.) She returned for a follow-up evaluation on June 23, 2006, and complained that her eyes hurt in the sinus area. (R. at 372.) Dr. Herman suggested that she try Mucinex or Humibid. (*Id*.)

Plaintiff returned to Dr. Herman on September 5, 2006. (R. at 370.) She reported that her vision seemed blurry, on and off at a distance and nearby, and her left eye felt tender to the touch. (*Id*.) Dr. Herman noted that she had been in a car accident two weeks before, and he also listed stroke, asthma, and allergies as miscellaneous information. (*Id*.) He recommended that she use Cosopt two times a day in both eyes. (*Id*.)

On October 17, 2006, Plaintiff underwent an MRI of the cervical spine without contrast, and an MRI of the lumbar spine without contrast. (R. at 460-63.) The MRI of the cervical spine demonstrated "mild multilevel bulging discs, facet degenerative joint disease and uncovertebral degenerative changes," "mild effacement of the ventral CSF space at C5-6," and "mild bilateral foraminal narrowing at C3-4. (R.

3

at 460-61.)  The MRI of the lumbar spine demonstrated "mild multilevel bulging discs and facet degenerative joint disease."  (R. at 463.)

Plaintiff returned to Dr. Herman on November 27, 2006, but reported no change since her last visit. (R. at 368.)  She underwent a Scanning Laser Polarimetry in both eyes, which revealed mild decrease in retinal nerve fiber layer thickness.  (R. at 267.)  Dr. Herman prescribed Cosopt for both eyes.  (R. at 366.)

On March 16, 2007, Plaintiff received an Magnetic Resonance Angiogram (MRA) of her brain at Dr. Huff's request.  (R. at 458.)  It revealed that the right carotid bulb and internal carotid artery were diffusely abnormal and small.  (*Id.*)  A gadollnium-enhanced MRA was recommended to better evaluate the right carotid.  (*Id.*)  A follow-up MRA on April 3, 2007 revealed occlusion in the right carotid artery and possible left carotid siphon stenosis.  (R. at 494-496.)

On May 8, 2007, Plaintiff returned to Dr. Herman for a follow-up evaluation and a Scanning Laser Polarimetry due to her glaucoma.  (R. at 362.)  It showed no retinal nerve fiber layer pathology in the right eye and mild decrease in retinal nerve fiber layer thickness in the left eye.  (*Id.*)

Plaintiff called VisionQuest on May 18, 2007, complaining of a red painful eye all day.  (R. at 356.) She was told over the phone that her symptoms did not sound pressure-related.  (*Id.*)  Due to distance of the office from her home, she could not go into VisionQuest that day to see Dr. Herman, and she was told to try her optometrist's office for a check-up.  (*Id.*)

On August 21, 2007, imaging revealed complete occlusion of the right supraclinoid internal carotid artery secondary to multisegmental vaso-occlusive disease.  (R. at 492.)

Plaintiff returned to Dr. Herman for a cataract and glaucoma check on November 6, 2007, and medical and ocular review revealed no change from her May 8, 2007 appointment.  (R. at 354.)

4

On February 12, 2008, she presented to Dr. Herman for a follow-up examination. (R. at 346.) She complained of feeling tired in both eyes on and off, trouble seeing objects at a distance, and having to drive at night due to a glare. (*Id.*)

On February 20, 2008 and February 27, 2008, Dr. Herman performed cataract removal surgery in Plaintiff's left and right eyes, respectively. (R. at 324.) She was told to come back in three weeks for a check-up. (R. at 344.) On March 18, 2008, she reported that she was still seeing a glare and lights off and on, but had no pain or discomfort. (*Id.*) Dr. Herman completed a work release for her indicating that she was able to return to work on March 19, 2008. (R. at 339.)

Dr. Herman completed a Physician's Certification for Disability Benefits indicating a diagnosis of glaucoma and cataracts in both eyes. (R. at 336.) He listed Plaintiff's disability start and end dates as February 19, 2008 and March 19, 2008, respectively. (*Id.*) Plaintiff had no limitations in doing her job as of March 19, 2008. (*Id.*)

On April 18, 2008, Plaintiff returned to Dr. Herman for a follow-up visit complaining that everything looked blurry at a distance and nearby, and she had headaches that came and went. (R. at 335.) Dr. Herman noted that her plan was to follow-up with him in late May. (*Id.*)

On April 22, 2008, Plaintiff underwent an MRI of her brain at Dr. Huff's request. (R. at 451.) The MRI revealed "unchanged occlusion of the right internal carotid artery, with appearance to attenuated flow void within the left carotid canal. (*Id.*) There was no MRI evidence of acute infarcts, intracranial bleeds, or masses. (*Id.*)

On July 7, 2008, Plaintiff underwent a neuropsychological evaluation by David Cobbs, Ph.D., at Dr. Huff's referral. (R. at 428.) Test scores revealed that Plaintiff had a full scale IQ of 75 on the WAIS-

5

III, consistent with borderline intellectual functioning.  (R. at 431.)  Dr. Cobb noted that the test scores did

not suggest an unstable clinical picture and there was no evidence of an acute condition present.  (R. at

435.)  He found that her scores were likely descriptive of a fairly longstanding pattern of below average

abilities in several areas of cognitive processing.  (*Id.*)

On January 1, 2009, Plaintiff presented to Dr. Huff for a follow-up visit.  (R. at 407.)  She reported

still having blurred vision on and off, and she did not believe that her eye medication was helping.  (*Id.*)  She

still suffered from migraines occasionally, and they went away with Midrin.  (*Id.*)  She was under a lot of

stress and her moods fluctuated depending on her stress level.  (*Id.*)  She also complained of tingling in her

left forearm.  (*Id.*)  Dr. Huff recommended that she see her optometrist again for her vision complaints,

resume taking Elavil for insomnia and headache prevention, and return to the office for a follow-up visit in

six months.  (R. at 408.)

Sometime in late 2009 or early 2010, Plaintiff presented to Dr. Henry Armstrong for an evaluation

of chest pain that had been present for two months.  (R. at 398.)  She was assessed with atypical chest pain

and low back pain.  (*Id.*) Dr. Armstrong referred her for an exercise stress test, which revealed noncardiac

chest pain syndrome.  (R. at 398, 405.)

On February 23, 2010, she complained of cough, dyspnea, shortness of breath and wheezing.  (R.

at 400.)  A review of systems was unremarkable except for chest pain.  (*Id.*)  Dr. Armstrong's impression

was asthma, and Plaintiff was told to return to his office as needed, or if her systems worsened.  (*Id.*)

Plaintiff returned to Dr. Armstrong's office on August 24, 2010 due to hypertension.  (R. at 402.)

Dr. Armstrong noted that she had no previous diagnosis of hypertension, but she had been seen by Dr.

Huff, who told her she had elevated blood pressure.  (*Id.*)  Dr. Armstrong assessed her with mild essential

hypertension and prescribed her Maxzide. (*Id.*)

On September 16, 2010, Plaintiff underwent a clinical interview and medical examination by Frank Crumley, M.D. at the request of the Disability Determination Service. (R. at 414.) Dr. Crumley generally observed that Plaintiff was cooperative and answered questions readily. (*Id.*) She sometimes appeared to be dozing off momentarily and did not answer a question until it was repeated loudly, and did not seem to realize it. (*Id.*) She reported that she has been depressed for years, and it was becoming worse. (*Id.*) She had crying spells, increased appetite, sleep disturbance, and wanted to be alone. (*Id.*) She was tired, had difficulty understanding, and was irritable. (*Id.*) She had frequent panic attacks at least two times a week. (*Id.*) Her symptoms interfered with work. She could not concentrate and made mistakes, so she was laid off. (R. at 415.) As for activities of daily living, she reported that she lived with her adult daughter, who paid the bills, cooked, and did the shopping. (*Id.*) Examination of her mental status revealed that her thinking was generally relevant, logical, and coherent, she was preoccupied with being watched excessively, and she had no hallucinations other than hearing her name called. (R. at 416.) Her mood appeared depressed with constriction of affect, and the estimate of her intelligence was below average. (*Id.*) Dr. Crumley diagnosed her with major depressive disorder, recurrent, severe with psychotic features; agoraphobia; cognitive disorder; borderline intellectual functioning manifested by IQ testing of 75; sleep apnea; eye disorder; and hypertension. (*Id.*) He found that she had a limited range of activity and a current Global Assessment of Functioning (GAF) of 45. (*Id.*)

On September 17, 2010, Plaintiff presented to Tamika Perry, D.O., at the Red Bird Community Clinic for a consultative exam at the request of the Disability Determination Service. (R. at 420.) She complained of stroke, glaucoma, sleep apnea, asthma, arthritis and low back pain. (R. at. 420.) She

reported that the arthritis was the main hindrance in her life and the main reason she was applying for disability. (*Id*.) A chest x-ray revealed mild cardiomegaly, and a knee x-ray revealed minimal degenerative hypertrophy in the patellofemoral compartment of the left knee joint. (R. at 410.) Perry concluded that Plaintiff demonstrated the ability to sit, stand, move about, lift/carry objects, hear, and speak. (R. at 421.) Her asthma was very mild and well-controlled. (*Id*.) She had full-range of motion in her back, her grip strength was average bilaterally, and her muscleskeletal exam was benign. (R. at 422.)

Plaintiff returned to Dr. Armstrong on December 15, 2010, for a hypertension evaluation. (R. at 424.) He assessed her with benign essential hypertension and prescribed her clonidine for "improved and continuous blood pressure control." (*Id*.)

On September 19, 2011, Dr. Huff completed a medical source statement rfor Plaintiff's application for social security benefits. (R. at 426.) She believed Plaintiff was limited in her ability to work due to her "extensive medical problems." (*Id*.)

On October 14, 2011, an x-ray of Plaintiff's cervical spine showed mild degenerative spondylosis and disc space narrowing at C5-C6. (R. at 499.) An x-ray of her lumbar spine revealed moderate degenerative facet joint hypertrophy from L1-L2 through L5-S1. (*Id*.)

On October 18, 2011, Plaintiff presented to Folashade F. Lester, M.D., at Baylor Family Medicine at Uptown, in order to "establish primary care." (R. at 544.) Her impressions were uncontrolled hypertension, a cerebral vascular accident, insomnia, menopause-related vasomotor symptoms, and hot flashes. (R. at 546-47.) Dr. Lester set a goal for an  average blood pressure. (R. at 549.)

On October 24, 2011, Dr. Kelley Davis performed a medical evaluation of Plaintiff. (R. at 504.) She noted, among other things, that Plaintiff had joint pain and muscle weakness, was chronically obese,

8

and had uncontrolled hypertension.  (R. at 505-06.)

On October 20, 2011, Barbara Brucken, Ph.D., performed a psychological evaluation of Plaintiff. (R. at 531.) She appeared adequately groomed and casually dressed, her posture and gait were normal, and there were no other notable mannerisms or behaviors until the mental status exam began.  (*Id.*) Dr. Brucken reported that when examining her mental status, Plaintiff's whole demeanor and the way she related changed to hesitation, and she did not know very simple things.  (*Id.*) As to her activities of daily living, she needed help in and out of the bathtub but was capable of bathing herself.  (R. at 532.)  Her daughter and a friend handled her appointments and medication.  (*Id.*)  She did some cooking but not many chores.  (*Id.*) She shopped, managed her money, read the Bible, watched TV, and visited with her mother, daughter, and a friend.  (*Id.*) Dr. Brucken noted that she might have trouble adjusting to changes in social, work or personal circumstances, unless she chose to make the changes.  (R. at 533.) Her prognosis was guarded and her depression appeared to be connected to her physical health.  (*Id.*)

On November 7, 2011, Plaintiff returned to Dr. Lester for a well woman visit and as a result of vision black-outs.  (R. at 553.)  After a referral, Plaintiff underwent a study on January 1, 2012, and the bone mineral density of her lumbar spine and hip were found to be normal.  (R. at 556, 560.)

On November 21, 2011, Susan Posey, a state agency medical consultant (SAMC), completed a Psychiatric Review Technique (PRT) form.  (R. at 511-524.)  Dr. Posey found that Plaintiff had medically determinable impairments of mood disorder and panic with agoraphobia that did not precisely satisfy the requirements for an affective disorder under the listings in section 12.04 of 20 C.P.R. Part 404, Subpart P, Appendix 1 and for an anxiety-related disorder under section 12.06 of the listings, respectively. (R. at 514, 516.)  She noted that Plaintiff had mild restriction in activities of daily living; moderate difficulties in

maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 521.) The consultant's notes associated with the PRT referenced current medications of cymbalta, viox, and lexapro. (R. at 523.)

The SAMC also completed a Mental Residual Functional Capacity Assessment on November 21, 2011. (R. at 525-527.) She found Plaintiff not significantly limited to moderately limited in various aspects of understanding and memory and sustained concentration and persistence. (R. 525-26.) Plaintiff was also not significantly limited to moderately limited in various aspects of social interaction and adaptation. (R. at 329.) Dr. Posey assessed Plaintiff's functional capacity as follows: "Claimant can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, and respond appropriately to changes in a routine work setting. (R. at 527.) The SAMC noted that Plaintiff's alleged limitations were not fully supported by the available evidence of record. (*Id.*)

On December 3, 2011, Dr. Laurence Ligon, M.D., an SAMC, completed a Physical Residual Functional Capacity Assessment for Plaintiff. (R. at 534.) He noted a primary diagnosis of hypertension, a secondary diagnosis of lumbar degenerative disc disease and mild cervical degenerative disc disease, as well as other alleged impairments of glaucoma, asthma, and obesity. (*Id.*) He opined that Plaintiff had the physical residual functional capacity (RFC) to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and pull an unlimited amount of weight with hand and/or foot controls; with no postural, manipulative, visual, communicative, or environmental limitations. (R. at 535-38.) Dr. Ligon noted that Plaintiff's alleged limitations were not fully supported by the evidence of record. (R. at 539.)

10

Plaintiff returned to Dr. Lester on January 19, 2012, due to vision problems.  (R. at 564.)  Dr. Lester ordered a carotid artery ultrasound, which did not reveal anything abnormal.  (R. at 566, 570.)  Also, a bone densitometry of her lumber spine revealed normal bone density. (R. at 560.)

On March 9, 2012, Dr. James B. Murphy, Ph.D., an SAMC, completed Case Assessments for reconsideration of the December 3, 2011 assessment.  (R. at 543-43.)  Based upon the evidence in the file, he affirmed the assessment.  (*Id.*)  Plaintiff did not allege any worsening or new conditions, a clinical evaluation was performed at the initial assessment, and no updated medical evidence of record was received.  (*Id.*)

On April 23, 2012, Plaintiff returned to Dr. Lester complaining of migraine headaches.  (R. at 574.)  Dr. Lester discussed stress management with her and prescribed Tramadol.  (R. at 575.)

On October 2, 2012, Plaintiff's optometrist reported astigmatism, presbyopia, and glaucoma in the right  eye and myopia, presbyopia, and glaucoma in the left eye. (R. at 579.)

On August 7, 2012, Plaintiff's hypertension was improved.  (R. at 596, 598.)  On August 30, 2012, the optometrist noted that her on-going headaches were not well controlled, and that she should seek input from a neurologist.  (R. at 593-94.)  On February 7, 2012, Plaintiff presented with back pain, and Dr. Lester prescribed Mobic.  (R. at 583-84.)

### 3.   Hearing Testimony

On April 1, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 34-85.)  Plaintiff was represented by a non-attorney representative.  (R. at 36.)

#### a.   *Plaintiff's Testimony*

Plaintiff testified that she was 56 years old, 5 feet 6 inches tall, weighed about 210 pounds, and

11

lived with her daughter.  (R. at 43.)  She was left-handed.  (*Id.*)

Plaintiff graduated from high school and did not complete any higher or specialized education.  (R. at 46.)  Between 1998 and 2010, she worked at National Semiconductors doing "assembly work."  (R. at 48.)  She stood up a lot and moved heavy boxes from one place to another.  (*Id.*)  She could not go out and find another job because the lower part of her back was "messed up" and her neck hurt.  (R. at 50.)  The pain in her back was below her belt line and went up and down her spine.  (R. at 51.)  She rated her pain at an 8, on a scale of 0 to 10, with 0 being pain free and 10 being such terrible pain, she would go to the emergency room.  (*Id.*)  She rated the pain in her neck at a 7.  (R. at 52.)

Plaintiff was laid off from work on January 20, 2010, due to a "downturn."  (R. at 44-45.)  She was messing up a lot at work, and she would have been fired if she hadn't been laid off.  (R. at 45.)  She started receiving unemployment benefits at that time and had not worked since then.  (R. at 44.)  She was no longer receiving unemployment benefits.  (R. at 46.)

Even with glaucoma drops, Plaintiff's vision was blurry.  (R. at 53.)  She could still see, but she would sometime lose vision on her right eye.  (*Id.*)  Her vision would be out for about five minutes, and she would have to "work it back."  (*Id.*)  This had happened maybe three or four times since January 20, 2010.  (R. at 53-54.)  She could still see well enough to read, but not all the time.  (R. at 54.)  Plaintiff stopped driving at the end of 2011 because she was not seeing too well.  (*Id.*)

No doctors had imposed restrictions on her ability to drive, lift, carry, walk, sit, or stand.  (R. at 55.)  She had been shot four or five times in her lower back, her chest, and her hand at the age of 27 or 28.  (R. at 55-56.)  At some point after surgery due to the gun wound shots, she had a steroid injection.  She had also been diagnosed with obstructive sleep apnea and was using a CPAP machine.  (R. at 57.)

On an average day, Plaintiff did not think she could pick up something weighing 20 or 25 pounds, and she did not know if she could pick up something weighing 10 pounds. (R. at 57-58.) She could walk about 10 feet on a level surface before she would start hopping and would want to sit down. (R. at 58-59.) She could stand for about 10-12 minutes if she could move up against something. (R. at 59.) She could sit upright with her feet on the floor for about six or seven minutes before she would have to get up. (*Id.*)

Plaintiff had trouble remembering things and would sometimes walk into the wrong room. (R. at 60.) She was able to help her adult daughter with shopping, cooking, and cleaning most of the time. (R. at 61.) She had full blown migraines more than once a week. (R. at 62.) She was not sure how long each migraine lasted once she took her prescribed medicine. (*Id.*) She had difficulty comprehending things. (R. at 63.) The difficulty started before she stopped working, and it had gotten worse since then. (*Id.*) She was referred to a neurologist in February 2013 for her migraine headaches, but she did not see one because she did not have insurance. (R. at 64.)

Plaintiff spent about four or five hours a day laying down. (*Id.*) Her daughter moved in with her due to financial reasons and because she had health problems. (R. at 65.) She used a cane to help her walk, but it was not prescribed to her by a doctor. (R. at 66.) She did not try to use the stairs because she had to stop at every step. (*Id.*)

### b.      VE's Testimony

The VE testified that Plaintiff had past relevant work as an etcher/stripper semi-conductor wafers (590.684-0.26, medium, unskilled, SVP:2), a machine wafer operator (692.662-0.18, light, semi-skilled, SVP:4), and a cleaner/machine tender semi-conductor wafers (590.685-062, light, unskilled, SVP:2). (R. at 74-76.) He testified that Plaintiff was a floater, which meant that she was generally cross-trained in

13

several different machines, would float from one workstation to another, and take over where there was

a need. (R. at 76.) There is not a floater by definition in the Dictionary of Occupational Titles (the DOT).

(R. at 77.)  Plaintiff did both light and medium work, "all the way from unskilled to semi-skilled." (*Id*.)

When the ALJ asked the best way to classify her job, the VE responded that it was the cleaner/

machine tender, semi-conductor wafers, which was listed in the DOT as light and unskilled. (R. at 80.)

However, Plaintiff performed it at the medium level based on the other jobs. (*Id*.)

The postural activities for the cleaner/machine tender, semi-conductor wafers, was none, and the

manipulative functions were "frequent, frequent, frequent, and none." (R. at 81.) An unusual aspect of the

position was that the acuity was constant from "just in front of the face to just about 20 inches," and the

accommodation was normal. (*Id*.)

Regarding the past relevant work that Plaintiff performed at a light level, as normally performed at

medium level, the maximum tolerance for chronic absenteeism was one day per month. (*Id*.) A person

could learn the job by demonstration and verbal instruction within the first 30 days. (*Id*.) The tolerance

level for unscheduled breaks would be five minutes per hour at the lower end. (*Id*.) The VE did not think

that presented an issue. (*Id*.)

Upon examination by Plaintiff's representative, the VE testified that the job did not present a

sit/stand option because it was assembly line work. (R. at 83.)

C.    **The ALJ's Findings**

The ALJ issued her decision denying benefits on April 10, 2013. (R. at 29.) At step one,[3] she

---

[3]The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

found that Plaintiff had engaged in substantial gainful activity since her alleged onset date of January 20, 2010. (R. at 21.) At step two, she found that Plaintiff had thirteen severe impairments: disorders of the cervical and lumbar spines, mild degenerative joint disease in the left knee, history of transient ischemic attack, history of internal carotid artery stenosis and atherosclerosis in the left internal carotid artery, hypertension, migraine headaches, sleep apnea, "being status-post cataract surgery," glaucoma, morbid obesity, depression, cognitive disorder, and borderline intellectual functioning. (R. at 22.) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*.) Next, the ALJ determined that Plaintiff had the following Residual Functional Capacity (RFC): lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk six hours out of an eight-hour work day; sit six hours out of an eight-hour work day; push and pull in the amount of weight given; understand, remember and carry out simple, routine, repetitive instructions, respond appropriately to supervisors, coworkers, and the general public; and adequately attend to simple, routine, and repetitive tasks for up to two hours. (R. at 23.) At step four, based on the VE's testimony, the ALJ found that Plaintiff could perform past relevant work as a cleaner/machine tender, semi-conductor wafer. (R. at 29.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from her onset date through the date of the ALJ's decision. (*Id*.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's

position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2.     Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically

16

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to

the Commissioner at step five to show that there is other gainful employment available in the national

economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be

satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational

testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the

Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the

alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is

disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."

*Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### B.     Issue for Review

Plaintiff presents one issue for review:

> The Commissioner defines a composite job as having significant elements of two or more
> occupations and, as such, has no counterpart in the Dictionary of Occupational Titles. The
> vocational expert described Holland's past work as a floater [that] involved the performance of
> three different occupations. The Administrative Law Judge found Holland could not perform her
> past work as actually performed, but could perform the job as described in the Dictionary of
> Occupational Titles. Does substantial evidence support the ALJ's finding Holland could return to
> her past relevant work?

(doc. 12 at 8.)

### C.     Step Four - Division of Past Relevant Work

Plaintiff argues that the ALJ improperly divided her past relevant composite job into three identified

jobs and then focused on one job in determining that she could return to her past relevant work. (doc. 12

at 17-18.) She contends that she must be found capable of performing all the duties of her past job in

order to be found capable of performing her past relevant work. (*Id*. at 17.) Because her past relevant

work was a composite job that had no counterpart in the DOT, she could not return to her past work as

generally performed. (*Id*.) She also claims that because her past job included jobs performed at the medium exertional level and semi-skilled level, she could not perform her past work "as actually performed" because it exceeded the limitations in her RFC. (*Id*. at 16.)

Initially, it is the claimant's burden at Step 4 to establish that she cannot perform her past relevant work. *See Leggett*, 67 F.3d at 564. When determining whether or not a claimant retains the RFC to perform her past relevant work, the ALJ can look to either (1) the job duties peculiar to an individual job as the claimant actually performed it, or (2) the functional demands and job duties of the occupation as generally required by employees throughout the national economy. *Social Security Ruling: Program Policy Statement Titles II and XVI: Past Relevant Work - The Particular Job or The Occupation As Generally Performed*, SSR 82-61, 1982 WL 31387, at *1-2 (S.S.A. Nov. 30, 1981); *Leggett*, 67 F.3d at 565. Social Security Ruling ("SSR") 82-62 requires that where the ALJ has determined that a claimant retains the RFC to perform a past relevant job, the decision must contain the following specific findings: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job or occupation; and (3) a finding of fact that the individual's RFC would permit a return to his or her past job or occupation. *Social Security Ruling: Program Policy Statement Titles II and XVI: A Disability Claimant's Capacity To Do Past Relevant Work, In General*, SSR 82-62, 1982 WL 31386, at *4 (S.S.A. Nov. 30, 1981).

In regard to composite jobs, SSR 82-61 states, in part:

[C]omposite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT. Such situations will be evaluated according to the particular facts of each individual case. For those instances where available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational specialist or

vocational expert.

SSR 82-61, 1982 WL 31387, at *2.  Therefore, an ALJ may consult a VE to determine the proper characterization of the claimant's past work, and whether she can return to that past work as she actually performed it or whether she can perform the work as it is generally performed in the national economy.  *See id*; *Semien v. Colvin*, No. 12-02179, 2013 WL 3778984l, at *6 (W.D. La. July 17, 2013).

Here, at Step 4, the ALJ found that Plaintiff had past relevant work as a floater in the semiconductor industry, a job that was "most closely aligned with" a cleaner/machine tender, semi-conductor wafer as described in the DOT.  (R. at 29.)  She then found that this past relevant work was unskilled in nature and light in exertion, although it was performed by Plaintiff at the medium exertional level.  (*Id.*)  Based on Plaintiff's current RFC for light, unskilled work, and on the VE's testimony, the ALJ found that Plaintiff was capable of returning to her past relevant work as a cleaner/machine tender, semi-conductor wafer, as that job was generally performed in the national economy.  (*Id.*)

The Fifth Circuit has not specifically addressed the interpretation of SSR 82-61 and whether it is proper to segregate the different jobs of a composite job to determine whether a claimant has the RFC to return to past relevant work doing one of those jobs.  Neither has any other circuit court.  Although some district courts have addressed the issue, "the case law ... is not uniform, and provides no solid answers with regard to how much bifurcation of jobs can occur without error."  *See Thomas v. Comm'r of Soc. Sec. Admin*, No. 1:02-CV-925, 2005 WL 588752, at * 7 (E.D.Tex. Jan. 3, 2005).  Some cases have found that a claimant who is able to perform either or all of the jobs composing her past relevant work as it is

performed in the national economy is capable of performing her past relevant work. *See. e.g., Behne v. Colvin*, No. 2:13-cv-086, 2014 WL 4802451, at *4-5 (N.D. Tex. Sep. 26, 2014)(finding the ALJ did not err in finding the plaintiff capable of performing past relevant work as a administrative assistant where she was determined to have been performing a job as both an administrator and a bartender); *Semien*, 2013 WL 3778984l, at *6 (holding the ALJ did not err in finding the plaintiff could perform past relevant work as a receptionist as it is generally performed in the national economy where the past job was composed of both receptionist and an inventory clerk work). These cases concluded that even though the claimant was incapable of performing the past relevant work as actually performed, she was capable of returning to past relevant work as to one or more of the jobs as they are actually performed in the national economy. *See Behne*, 2014 WL 4802451, at *4; *Semien*, 2013 WL 3778984l, at *6.

Other cases have found that a claimant is unable to perform her past relevant work if she is unable to perform each specific job composing her past relevant work. *See, e.g.*, *Armstrong v. Sullivan*, 814 F.Supp.1364, 1372 (W.D. Tex. 1993)(finding the ALJ improperly divided the composite job of cook/cashier into two jobs and focused on the less demanding job of cashier); *Henry v. Colvin*, No. 14-1660, 2015 WL 3902731, at *3 (W.D. La. June 24, 2015)(finding an ALJ must analyze whether a claimant can perform each job within a composite job, and he may not deem a claimant capable of performing past relevant work by dividing the demands of the composite job into separate jobs and finding the claimant capable of performing the least demanding one); *Henson v. Colvin*, No. 12-3053, 2014 WL 1154275, at *4 (E.D. La. Mar. 14, 2014)(same). These cases have generally concluded that a claimant should not be deemed capable of performing her past relevant work as that work is characterized by its

lowest exertional level.

In *Armstrong*, upon which Plaintiff and many district courts rely, the court found that the ALJ had erred by separating the plaintiff's composite job of cook and cashier and finding that she could perform the less demanding job of a cashier.  814 F.Supp. at 1372.  In reaching this conclusion, *Armstrong* cited *Valencia v. Heckler,* 751 F.2d 1082, 1086-87 (9th Cir. 1985), for the proposition that "[g]enerally, an ALJ may not find a claimant capable of performing his or her past relevant job, if the claimant is not capable of performing *all* the duties of that job." *Id*. (emphasis in original).  It quoted the *Valencia* court's proposition that "[classifying] an applicant's 'past relevant work' according to the least demanding function of the claimant's past occupations is contrary to the letter and spirit of the Social Security Act." *Id*.

The holding in *Valencia* that a claimant must be capable of performing all the duties of his past relevant job in order to be found capable of performing that job is contrary to Fifth Circuit law.  In *Leggett*, the Fifth Circuit held that a claimant's inability to perform certain requirements of his past job does not mean that she is unable to perform "past relevant work" as that phrase is defined in the regulations.[4] *Leggett*, 67 F.3d at 564.  It found that although the claimant in that case, who was capable of performing in a sedentary environment, could no longer carry out the specific duties of a convenience store cashier, he could perform the duties of a cashier as generally found in the national economy because those positions ranged from medium work to sedentary. *Id*. at 565.  The claimant was therefore capable of being a cashier and was just limited in the type of cashier positions he could take. *Id*. at 564 n. 11.  It held that a claimant need not be able to perform all the requirements of her past job in order to be able to perform her past

---

[4]"Past relevant work" is defined in the regulations as the actual demands of past work or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61, 1982 WL 31387, at *2; *Jones v. Bowen*, 829 F.2d 524, 527 n. 2 (5th Cir. 1987).

relevant work as it is generally performed in the national economy.  *See id*. at 564-65.

Although *Leggett* is not directly on point, its holding that claimant need not be able to perform all the requirements of her past job in order to be able to perform her past relevant work as it is generally performed in the national economy is instructive.  In the Fifth Circuit, it is proper for an ALJ to segregate portions of a former job in determining whether a claimant can perform past relevant work.  This holding directly conflicts with the Ninth Circuit's decision in *Valencia*, upon which the *Armstrong* decision relies.  *See Thomas,* 2005 WL 588752, at *7 (finding *Armstrong* and *Leggett* in conflict on this issue).  *Armstrong* is not persuasive for this reason.  Based on *Leggett,* the ALJ did not err by considering whether Plaintiff was capable of returning to her past relevant work as a cleaner/machine tender, semi-conductor wafer, as that job was generally performed in the national economy.

Furthermore, the ALJ in this case did not simply segregate Plaintiff's past relevant work and then consider only the least demanding job function in determining that Plaintiff could perform her past relevant work, as in *Armstrong*.  Here, the VE testified that although Plaintiff's past relevant work was composed of three distinct jobs, her job as a floater was best classified as the cleaner/machine tender, semi-conductor wafers.  (*See* R. at 80.)  As noted, an ALJ may consult a VE to determine the proper characterization of a claimant's past work.  (SSR 82-61, 1982 WL 31387, at *2.)  The VE considered the other jobs in determining that Plaintiff's past relevant work of cleaner/machine tender, semi-conductor wafer was performed at the medium level, as opposed to unskilled and light as provided by the DOT.  (*See* R. at 76, 80.)  He testified that Plaintiff would simply fill in on a job when a worker was absent or went on break, and he considered Plaintiff's testimony that she mostly performed the cleaner/machine tender job.  (R. at 76, 79.)  The ALJ took the VE's characterization of Plaintiff's job, based on how often and to what extent

she performed certain duties/jobs, and determined that she could do that job as generally performed in the national economy given the job's exertional level and her RFC. *See Bryant v. Astrue*, No. 09-1499, 2010 WL 3541097, at *5 (W.D. La. July 30, 2010) (finding the ALJ complied with SSR 82-61 where he consulted with a VE who listened to the plaintiff's testimony regarding his past relevant work, "but opined that his prior job was properly classified as a garage supervisor which is generally performed at the light exertional level", so "although plaintiff could not return to his past relevant work as he actually performed it, he could perform the work as it is generally performed in the national economy").[5] Plaintiff has not shown that the ALJ improperly divided her past relevant job requirements and considered only the least demanding job in finding she could perform her past relevant work.

In conclusion, the ALJ did not err in considering the VE's testimony that Plaintiff's past relevant job, although composed of three separate jobs, was best characterized as the cleaner/machine tender, semi-conductor wafer, and considering the exertional level of only that job in determining whether Plaintiff could perform it as it is generally performed in the national economy.

### III.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

---

[5]To the extent Plaintiff disagreed with the VE's characterization of her prior work, she was obligated to press the issue on cross-examination. *Bryant*, 2010 WL 3541097, at *5 ("[I]f plaintiff harbored any doubts concerning the VE's characterization of his prior work, plaintiff was obliged to emphasize the alleged inconsistency and to press the issue upon cross-examination."). Plaintiff failed to question the VE's characterization of her past relevant work at the hearing. As the claimant, she retains the burden to establish that she is unable to perform her past relevant work. *Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). She has failed to argue or establish that she is unable to perform her past relevant work as a cleaner/machine tender, semi-conductor wafer.

**SO RECOMMENDED** on this 31ˢᵗ day of August, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE